**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Laura Hatch

    v.                                        Case No. 15-cv-251-JL
                                            Opinion No. 2016 DNH 130
Carolyn Colvin, Acting
Commissioner, Social
Security Administration

**O R D E R**

    Pursuant to 42 U.S.C. § 405(g), Laura Hatch moves to

reverse the Acting Commissioner's decision to deny her

application for supplemental security income, or SSI, under

Title XVI of the Social Security Act, 42 U.S.C. § 1382.  The

Acting Commissioner, in turn, moves for an order affirming her

decision.  For the reasons that follow, this matter is remanded

to the Acting Commissioner for further proceedings consistent

with this order.

**I. Standard of Review**

    The applicable standard of review in this case provides, in

pertinent part:

> The [district] court shall have power to enter, upon
> the pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of the
> Commissioner of Social Security, with or without

> remanding the cause for a rehearing. The findings of
> the Commissioner of Social Security as to any fact, if
> supported by substantial evidence, shall be conclusive
> . . . .

42 U.S.C. § 405(g) (setting out the standard of review for

decisions on claims for disability insurance benefits); see also

42 U.S.C. § 1383(c)(3) (establishing § 405(g) as the standard of

review for SSI decisions). However, the court "must uphold a

denial of social security . . . benefits unless 'the [Acting

Commissioner] has committed a legal or factual error in

evaluating a particular claim.'" Manso-Pizarro v. Sec'y of HHS,

76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting Sullivan v.

Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Acting

Commissioner's findings of fact be supported by substantial

evidence, "[t]he substantial evidence test applies not only to

findings of basic evidentiary facts, but also to inferences and

conclusions drawn from such facts." Alexandrou v. Sullivan, 764

F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner,

360 F.2d 727, 730 (2d Cir. 1966)). In turn, "[s]ubstantial

evidence is 'more than [a] mere scintilla. It means such

relevant evidence as a reasonable mind might accept as adequate

to support a conclusion.'" Currier v. Sec'y of HEW, 612 F.2d

594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  But, "[i]t is the responsibility of the [Acting Commissioner] to determine issues of credibility and to draw inferences from the record evidence.  Indeed, the resolution of conflicts in the evidence is for the [Acting Commissioner], not the courts."  Irlanda Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (citations omitted).  Moreover, the court "must uphold the [Acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."  Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988) (per curiam).  Finally, when determining whether a decision of the Acting Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole."  Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## II. Background

    The parties have submitted a Joint Statement of Material Facts.  That statement[1] is part of the court's record and will be summarized here, rather than repeated in full.

---

[1] Document no. 11.

In June of 2011, Hatch went to the emergency room with symptoms of what was subsequently diagnosed as multiple sclerosis ("MS").[2]  She initially spent five days in Massachusetts General Hospital ("MGH"), and was discharged to a rehabilitation hospital, where she spent nearly a month.  In between her two hospitalizations, Hatch saw Dr. Eric Klawiter at the MGH Multiple Sclerosis Clinic, and continued to treat with him until July of 2012.  In September of 2011, shortly after she was discharged from the rehabilitation hospital, Hatch began seeing Dr. Joann Buonomano, a family practitioner, as her primary care provider.  In March of 2013, Dr. Klawiter referred Hatch to Dr. Ann Cabot, another specialist in MS.  Dr. Cabot, in turn, saw Hatch in March of 2013 and again in January of 2014. In addition to MS, Hatch has been diagnosed with obesity, depression, anxiety, and a learning disability.

---

[2] Multiple sclerosis is a "common demyelinating disorder of the central nervous system, causing patches of sclerosis (plaques) in the brain and spinal cord."  Stedman's Medical Dictionary 1733 (28th ed. 2006).  Its "symptoms include visual loss, diplopia, nystagmus, dysarthria, weakness, paresthesias, bladder abnormalities, and mood alterations . . . and clinically the symptoms show exacerbations and remissions."  Id.

The record includes five opinions concerning Hatch's residual functional capacity ("RFC").[3]  Three of those opinions are relevant to the issues discussed in this order:  (1) a Physician/Clinician Statement of Capabilities completed in August of 2012 by Dr. Buonomano; (2) a physical RFC assessment prepared in October of 2012 by a state-agency consultant, Dr. Hugh Fairley, based upon a review of the record;[4] and (3) a Physical Impairment Medical Source Statement completed in January of 2014 by Dr. Buonomano.  In January of 2014, Dr. Klawiter was asked to complete a Multiple Sclerosis Medical Source Statement on Hatch, but he declined to do so, explaining that he had not seen Hatch for 18 months.  While Hatch has submitted treatment records from Dr. Cabot, the record does not include an RFC assessment from her either.

---

[3] "Residual functional capacity" is a term of art that means "the most [a claimant] can still do despite his limitations." 20 C.F.R. § 416.945(a)(1).

[4] The record before Dr. Fairley included "no indication that there [was] medical or other opinion evidence."  Tr. 96.  Thus, there is no indication that Dr. Fairley ever considered Dr. Buonomano's 2012 opinion when he assessed Hatch's RFC.

In her evaluation of Hatch's physical capacities, completed in August of 2012, Dr. Buonomano indicated a diagnosis of multiple sclerosis.  She opined that with normal breaks, Hatch could sit for a maximum of two hours a day, stand for a maximum of two hours a day, and walk for a maximum of two hours a day. In addition, Dr. Buonomano ascribed a variety of exertional, postural, manipulative, and environmental limitations.  She also opined that while Hatch was capable of participating in work-related activities, she could do so for less than ten hours per week.  Finally, Dr. Buonomano stated that the restrictions she placed on Hatch's ability to work should remain in place for 12 months.

Approximately two months after Dr. Buonomano completed her evaluation, Dr. Fairley conducted his RFC assessment.  Like Dr. Buonomano, Dr. Fairley identified exertional, postural, and environmental limitations, but he identified no manipulative limitations.  With respect to exertional limitations, Dr. Fairley opined that Hatch was able to sit (with normal breaks) for about six hours in an eight-hour workday and was able to stand and/or walk (with normal breaks) for two hours in an eight-hour workday.  In support of his postural limitations, Dr. Fairley noted Hatch's diagnosis of MS and also said this:  "Easy

fatigueability is her main problem."  Administrative Transcript
(hereinafter "Tr.") 97.

In January of 2014, Dr. Buonomano provided a second medical
opinion.  In her Physical Impairment Medical Source Statement,
Dr. Buonomano indicated that she had seen Hatch every three to
six months for the previous two years, starting on January 6,
2012.[5]  She indicated diagnoses of MS, depression, and a learning
disability.  Under the heading "Prognosis," she wrote:
"Progressive decline."  Tr. 860.  Dr. Buonomano described
Hatch's symptoms this way:  "Pain, numbness, weakness on [left]
side, both upper [and] lower extremities, [e]xtreme fatigue,
headaches."  Id.  Dr. Buonomano further stated:  "Symptoms are
random, can be very severe or moderate.  More bad days than good
days."  Id.  With regard to Hatch's functional capacity, Dr.
Buonomano opined that: (1) Hatch's "experience of pain or other
symptoms [was constantly] severe enough to interfere with
attention and concentration needed to perform even simple work
tasks," Tr. 861; (2) Hatch was "[i]ncapable of even 'low stress'
jobs," id.; (3) she could sit (with normal breaks) for less than
two hours in an eight-hour workday; (4) she could stand/walk

_____

[5] The record shows that Hatch began seeing Dr. Buonomano in
September of 2011.

(with normal breaks) for less than two hours in an eight-hour workday; (5) she would need three to five unscheduled breaks each day; and (6) she would be absent from work more than four days a month as a result of her impairments or treatment for them.  When asked whether Hatch would have good days and bad days, Dr. Buonomano responded:

> MS is a relapsing disease that is unpredictable and results in periods of incapacity.  In addition, [Hatch] has total left-sided weakness, pain, and numbness from the disease.

Tr. 863.  Finally, in response to a question about other limitations that would affect Hatch's ability to work on a sustained basis at a regular job, Dr. Buonomano wrote:  "She cannot work in any extreme environment.  She is susceptible to vision changes, randomly.  She is not capable of regular employment."  Tr. 864.

After the Social Security Administration denied Hatch's claim, she received a hearing before an Administrative Law Judge ("ALJ").  At the hearing, the ALJ heard testimony from a vocational expert ("VE").  In response to hypothetical questions based largely upon the RFC assessed by Dr. Fairley, the VE testified that a person with those limitations could perform the jobs of surveillance system monitor, addressing clerk, and

document preparer.  Rather than asking a hypothetical question
incorporating the more restrictive limitations from Dr.
Buonomano's RFC assessment, the ALJ observed:  "I think further
limitations would be tied to the medical source statement [i.e.,
Dr. Buonomano's 2012 opinion] and I think that's an obvious
result there, so I won't ask that."  Tr. 90.

    The ALJ issued a decision that includes the following
relevant findings of fact and conclusions of law:

    2.  The claimant has the following severe impairments:
    multiple sclerosis; headaches; obesity; depression;
    and anxiety (20 CFR 416.920(c)).

    . . . .

    3.  The claimant does not have an impairment or
    combination of impairments that meets or medically
    equals the severity of one of the listed impairments
    in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
    416.920(d), 416.925 and 416.926).

    . . . .

    4.  After careful consideration of the entire record,
    I find that the claimant has the residual functional
    capacity to perform sedentary work as defined in 20
    CFR 416.967(a), except she is limited to
    lifting/carrying up 5 pounds frequently and 10 pounds
    occasionally with her non-dominant left hand; and
    pushing/pulling on an occasional basis with her left
    side.  She is unable to climb ladders, rope[s] or
    scaffolds, and she is limited to occasional climbing
    of ramps and stairs.  She is able to frequently stoop,
    and occasional[ly] crouch, crawl and kneel.  She is
    able to frequently handle and feel with her left hand,
    and [perform] no repetitive use of her left hand for

manipulation.  She is limited to occasional use of
foot controls with her left foot.  She must avoid
unprotected heights and prolonged exposure to
dangerous, moving machinery.  She is limited to
simple, routine and repetitive work, in an environment
without fast-paced production requirements.  She is
able to handle routine workplace changes.

. . . .

9.  Considering the claimant's age, education, work
experience, and residual functional capacity, there
are jobs that exist in significant numbers in the
national economy that the claimant can perform (20 CFR
416.969 and 416.969(a)).

Tr. 16, 17, 17, 24.

## III. Discussion

### A. The Legal Framework

To be eligible for supplemental security income, a person
must be aged, blind, or disabled, and must meet certain
requirements pertaining to income and assets.  42 U.S.C. §
1382(a).  The only question in this case is whether Hatch was
disabled between June 26, 2012, and March 14, 2014.

To decide whether a claimant is disabled for the purpose of
determining eligibility for SSI benefits, an ALJ must employ a
five-step process.  See 20 C.F.R. § 416.920.

The steps are:  1) if the [claimant] is engaged in
substantial gainful work activity, the application is
denied; 2) if the [claimant] does not have, or has not
had within the relevant time period, a severe

10

impairment or combination of impairments, the
application is denied; 3) if the impairment meets the
conditions for one of the "listed" impairments in the
Social Security regulations, then the application is
granted; 4) if the [claimant's] "residual functional
capacity" is such that he or she can still perform
past relevant work, then the application is denied; 5)
if the [claimant], given his or her residual
functional capacity, education, work experience, and
age, is unable to do any other work, the application
is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20
C.F.R. § 416.920).

The claimant bears the burden of proving that she is
disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  She
must do so by a preponderance of the evidence.  See Mandziej v.
Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.
Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).  Finally,

[i]n assessing a disability claim, the [Acting
Commissioner] considers objective and subjective
factors, including:  (1) objective medical facts; (2)
[claimant]'s subjective claims of pain and disability
as supported by the testimony of the claimant or other
witness; and (3) the [claimant]'s educational
background, age, and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797
F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690
F.2d 5, 6 (1st Cir. 1982)).

B. Hatch's Claims

Hatch claims that the ALJ erred by:  (1) using his lay knowledge to assess both her mental and physical RFCs; (2) failing to consider her back pain in combination with her other impairments when determining her RFC; and (3) failing to articulate good reasons for giving limited weight to Dr. Buonomano's 2014 opinion.  While it is perhaps a close question, Hatch's third claim is persuasive, and dispositive.

The court begins by acknowledging that under the circumstances of this case, Dr. Buonomano's 2012 opinion is not entitled to controlling weight,[6] and Hatch does not argue to the contrary.  Still, under the regulations governing the evaluation of SSI claims, an opinion from an acceptable medical source who has treated a claimant is usually entitled to substantial weight.[7]  As the regulations explain:

> Generally, we give more weight to opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to

---

[6] Dr. Buonomano's opinion is not entitled to controlling weight because it is inconsistent with Dr. Fairley's opinion. See 20 C.F.R. § 416.927(c)(2) (explaining that a treating-source opinion is entitled to controlling weight if, among other things, it "is not inconsistent with the other substantial evidence in [the claimant's] case record").

[7] All agree that Dr. Buonomano qualifies as an acceptable medical source under 20 C.F.R. § 416.913(a)(1).

provide a detailed, longitudinal picture of [a
claimant's] medical impairment(s) and may bring a
unique perspective to the medical evidence that cannot
be obtained from the objective medical findings alone
. . . .

20 C.F.R. § 416.927(c)(2); see also Social Security Ruling

("SSR") 96-2p, 1996 WL 374188, at *4 (S.S.A. July 2, 1996) ("In

many cases, a treating source's medical opinion will be entitled

to the greatest weight and should be adopted, even if it does

not meet the test for controlling weight."). Where, as in this

case, a treating source's medical opinion is not entitled to

controlling weight, the ALJ must "give good reasons . . . for

the weight [he] give[s] [the] treating source's opinion." 20

C.F.R. § 416.927(c)(2). Moreover, "the [SSI] regulations . . .

presuppose that [the opinions of] nontreating, nonexamining

sources [such as Dr. Fairley in this case] may override treating

doctor opinions, provided there is support for the result in the

record." Shaw v. Sec'y of HHS, 25 F.3d 1037, 1994 WL 251000, at

*4 (1st Cir. 1994) (unpublished table decision).

To determine the amount of weight to give a treating

source's opinions, an ALJ should consider:  (1) the length of

the treatment relationship and the frequency of examination; (2)

the nature and extent of the treatment relationship; (3)

supportability; (4) consistency with the record as a whole; (5)

13

the medical specialization of the person giving the opinion; and (6) other factors that tend to support or contradict the opinion.[8]  See 20 C.F.R. § 416.927(c)(2)-(6).  As for how to determine whether an ALJ has given good reasons for the amount of weight he has assigned a treating source's opinion, Judge McCafferty recently pointed out:

> To meet the "good reasons" requirement, the ALJ's reasons must be both specific, see Kenerson v. Astrue, No. 10-CV-161-SM, 2011 WL 1981609, at *4 (D.N.H. May 20, 2011) (citation omitted), and supportable, see Soto-Cedeño v. Astrue, 380 Fed. Appx. 1, 4 (1st Cir. 2010).  In sum, the ALJ's reasons must "offer a rationale that could be accepted by a reasonable mind." Widlund v. Astrue, No. 11-cv-371-JL, 2012 WL 1676990, at *9 (D.N.H. Apr. 16, 2012) (citing Lema v. Astrue, C.A. No. 09-11858, 2011 WL 1155195, at *4 (D. Mass. Mar. 21, 2011), report and recommendation adopted by 2012 WL 1676984 (D.N.H. May 14, 2012).

Jenness v. Colvin, No. 15-cv-005-LM, 2015 WL 9688392, at *6 (D.N.H. Aug. 27, 2015).  Regarding the specificity requirement,

> the notice of the . . . decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

---

[8] As examples of "other factors," the regulations identify: (1) the source's understanding of the SSA's disability programs and evidentiary requirements; and (2) "the extent to which [the] acceptable medical source is familiar with the other information in [a claimant's] case record."  20 C.F.R. § 416.927(c)(6).

SSR 96-2p, 1996 WL 374188, at *5.

In his decision, the ALJ explained the weight he gave to

Dr. Buonomano's 2014 opinion this way:

> I have given limited weight to the opinion of the
> claimant's primary care doctor, Joan [sic] Buonomano,
> M.D.  Dr. Buonomano, in a check-off form, opines that
> the claimant is not capable of "regular employment"
> and that she would likely miss at least four days per
> month due to her impairments.  She indicates the
> claimant has total left sided weakness and numbness
> from MS, and that she has significant limitations with
> reaching, handling and fingering.  She opines that the
> claimant is limited to lifting/carrying less than 10
> pounds, and would need to take unscheduled breaks
> during the workday.  I have given her opinion limited
> weight because it is inconsistent with her own
> treatment records.  The claimant's treatment records
> do not show disabling physical symptoms due to MS or
> other impairments.  Indeed, the records of Dr.
> Buonomano show mostly normal exams, with nonfocal
> motor examination, no spinal tenderness, normal mood
> and appropriate affect.  Her opinion is also
> inconsistent with claimant's recent medical records,
> which show mostly stable symptoms with medication.

Tr. 22 (citations to the record omitted).  In contrast to the

limited weight he gave Dr. Buonomano's opinion, the ALJ gave

"significant weight to the assessment of the State agency

medical consultant, Hugh Fairley, M.D."  Id.

The court begins by noting that while the ALJ criticized

Dr. Buonomano's opinion for being presented "in a check-off

form," Tr. 22, Dr. Buonomano included more narrative content on

that form than Dr. Fairley included in the RFC assessment to

which the ALJ gave significant weight.  That is not the only
problem with the ALJ's explanation.

Moving on, the ALJ correctly identified Dr. Buonomano as
Hatch's primary care doctor, but he said nothing about the
length, nature, or extent of the treatment relationship, or the
frequency with which Dr. Buonomano examined Hatch.  See 20
C.F.R. §§ 416.927(d)(2)(i) & (ii).  Dr. Buonomano's statement
indicates that she had seen Hatch every three to six months
since January of 2012,[9] yet the ALJ afforded greater weight to
the opinion of a physician who never examined Hatch, who appears
not to have considered Dr. Buonomano's 2012 opinion, and who
rendered his opinion on the effects of a progressive disease
about 15 months before Dr. Buonomano gave her second opinion on
Hatch's RFC.

Substantively, the ALJ gave two reasons for assigning
limited weight to Dr. Buonomano's opinion:  the opinion's
inconsistency with Dr. Buonomano's treatment records, and its

_____

[9] According to the parties' Joint Statement of Material
Facts, Dr. Buonomano examined Hatch six times before she
rendered her 2012 opinion and examined her four more times
before she rendered her 2014 opinion.

inconsistency with Hatch's recent medical records.  Each explanation is problematic.

Regarding the first one, the ALJ said that Dr. Buonomano's opinion was inconsistent with treatment records showing "mostly normal exams, with nonfocal motor examination, no spinal tenderness, normal mood and appropriate affect."  Tr. 22 (citing three of Dr. Buonomano's ten treatment records).  However, the ALJ did not indicate how nonfocal motor examinations,[10] a lack of spinal tenderness, normal mood, and appropriate affect were inconsistent with an opinion that Hatch would be absent from work more than four days per month due to the symptoms Dr. Buonomano identified in her statement, which include pain, numbness, weakness on Hatch's left side (including both extremities), extreme fatigue, and headaches.  Because the ALJ did not supportably identify any inconsistency between Dr. Buonomano's opinion and her treatment records, the purported

---

[10] The court does not know what "nonfocal motor examination" means, either in functional terms or otherwise, and the ALJ's decision provides no clarification.  That makes it difficult for the court to accept the proposition that Hatch's nonfocal motor examinations are inconsistent with Dr. Buonomano's opinion.

inconsistency on which the ALJ relied is not a good reason for discounting Dr. Buonomano's opinion.[11]

Turning to the ALJ's second explanation for giving limited weight to Dr. Buonomano's opinion, the ALJ said that opinion was inconsistent with Hatch's "recent medical records, which show mostly stable symptoms with medication." Tr. 22. Because the ALJ did not identify the "recent medical records" to which he was referring, his explanation is, necessarily, neither specific nor supported by the case record. See Jenness, 2015 WL 9688392, at *6. That said, if the "recent medical records" to which the ALJ referred were those generated by Hatch's visit to Dr. Cabot in January of 2014, Dr. Cabot's office note states, in pertinent part: "As far as symptoms she feels like she is getting worse over the past year . . . . If she is tired she notices more fatigue." Tr. 882. The note continues:

> Fatigue has been an issue, she has noted poor sleep.
> She feels like all she wants to do is sleep. She has
> not pursued any treatment for this. Nothing has made
> this better or worse.

_____

[11] Moreover, Dr. Buonomano's identification of fatigue as a symptom of Hatch's MS is consistent with Dr. Fairley's observation that "[e]asy fatigueability [was Hatch's] main problem," Tr. 97, and is also consistent with testimony at Hatch's hearing, offered by both Hatch and her father, to the effect that Hatch was often unable to complete tasks she had started, such as preparing meals or washing dishes, due to a lack of energy resulting from her MS.

Id.  Finally, under the heading "Impression & Recommendations,"
Dr. Cabot wrote:

> I have encouraged her to stay hopeful that we can
> continue to work on her symptoms, her biggest
> complaint is that of fatigue.  She has not yet had a
> sleep study nor has she ever tried medication or
> exercise to work on her fatigue issues.

Tr. 884.  Whatever else Dr. Cabot's notes may say, they do not
describe "mostly stable symptoms with medication."  Tr. 22.

The bottom line is this.  Given Dr. Buonomano's prognosis
for progressive decline, the chronology of the medical opinions
at issue, the content of the relevant medical records, and the
requirements of the governing regulations, the court cannot say
that the ALJ offered a rationale that could be accepted by a
reasonable mind for giving greater weight to Dr. Fairley's
opinion than he gave to Dr. Buonomano's 2014 opinion.  On that
basis, this case must be remanded.

**IV. Conclusion**

For the reasons detailed above, the Acting Commissioner's
motion for an order affirming her decision[12] is denied, and
Hatch's motion to reverse that decision[13] is granted to the

---

[12] Document no. 12.

extent that this matter is remanded to the Acting Commissioner for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).  The clerk of the court shall enter judgment in accordance with this order and close the case.

   **SO ORDERED.**

_____
Joseph Laplante
United States District

Date: August 5, 2016

cc:   Laurie Smith Young, Esq.
      Robert J. Rabuck, AUSA

---

[13] Document no. 8.